Murphy, J.
Plaintiff Eric Fillmore (“Fillmore”) brought this action against the defendants: Leasecomm Corporation (“Leasecomm”) for declaratory judgment, rescission, and violations of G.L.c. 93A (Counts I-IV); Cardservice International, Inc. (“Cardservice”) for declaratory judgment, violations of G.L.c. 93A, civil conspiracy, and aiding and abetting (Counts I, V, VI and VII); and Linkpoint International, Inc. (“Linkpoint”) for declaratory judgment (Count I).
The defendants now move to dismiss Fillmore’s complaint pursuant to Mass.R.Civ.P. 12(b)(1) and 12(b)(6). The defendants assert that the Superior Court lacks subject matter jurisdiction in this case because Fillmore’s claim falls below the twenty-five thousand dollar jurisdictional threshold pursuant to St. 1996, c. 358, §4 as amended by St. 2000, c. 142. In addition, the defendants contend that Fillmore’s claims are defective because they fail to state a claim upon which relief can be granted.
For the reasons set forth below, the defendants’ Motion to Dismiss is allowed.
BACKGROUND
The facts are summarized as they appear in Fillmore’s complaint, with the truth of such facts and all reasonable inferences derived therefrom having been construed in favor of Fillmore.
This case arises from Fillmore’s attempt to establish an e-commerce business. On February 8, 2000, Fillmore attended a seminar in Seattle to learn how to sell products over the internet. Fillmore alleges that, *561 through a series of fraudulent representations and high-pressure sales tactics, a representative of Cardservice — a California corporation headquartered in Moorpark, California — induced him into signing a lease agreement with Leasecomm — a Massachusetts corporation headquartered in Woburn, Massachusetts. Pursuant to the lease, Fillmore was to pay $59.95 per month for 48 months for a total of $2,877.60. In exchange for his payments, Fillmore received license number CD005056, which consisted of a Login ID and Password for use in accessing a “payment gateway”[1] serviced by Linkpoint — a California corporation with its principal place of business in Moorpark, California.
Before accessing the payment gateway for the first time, Fillmore alleges that he was required to accept certain terms and conditions[2] of the gateway provider via a “click through” procedure on the payment gateway website. Fillmore alleges that these terms were not disclosed to him until he logged onto the payment gateway for the first time — after the Leasecomm lease had been fully accepted. In addition, in order to be able to use the payment gateway, Fillmore was required to enter into a separate merchant services agreement with Cardservice to process his internet credit card transactions, which Fillmore alleges required an additional monthly fee.
Fillmore alleges that Cardservice and Leasecomm carried out this transaction in conformance with their established business relationship that is memorialized in part by a “vendor agreement.” Pursuant to this vendor agreement, Cardservice markets products to merchants, obtains credit and other personal information from the merchants, and gives that information to Leasecomm for its review. Cardservice also supplies Leasecomm lease applications to merchants, assists in negotiating and completing the documents, and accepts down-payments from merchants on behalf of Leasecomm. Lastly, Cardservice ensures that the products are delivered to the merchants. Upon delivery of a product to a merchant, Leasecomm pays Cardservice an agreed-upon amount to acquire title to the product, which is leased back by Leasecomm to the merchant.
Fillmore alleges that Leasecomm has notified him that he is in breach of the lease agreement and has undertaken collection actions against him. Fillmore filed the instant complaint — on behalf of himself and all others who entered into identical Leasecomm contracts — seeking rescission of his lease agreement with Leasecomm, restitution, reasonable attorneys fees, additional injunctive relief, and a declaratory judgment. Fillmore seeks to certify a class of plaintiffs that consists of all persons and businesses who entered identical Leasecomm lease agreements within six years of the filing of this action; except for those members of the class certified for settlement purposes in the case of Wallace Dickey v. Cardservice Int’l, Inc. et al., District Court of Travis County, Texas, Case No. GN 301365. The defendants move to dismiss the plaintiffs complaint pursuant to Mass.R.Civ.P. 12(b)(1) and 12(b)(6).
DISCUSSION
In considering a motion to dismiss brought pursuant to Mass.R.Civ.P. 12(b), the court must accept as true the factual allegations of the well-pleaded complaint as well as any inferences that can be drawn from those allegations in favor of the plaintiff. Fairneny v. Savogran. Co., 422 Mass. 469, 470 (1996). Considering the pleadings and such inferences in this light, the complaint should not be dismissed “unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).
I. Fillmore’s Declaratory Judgment Claim Against All Parties (Count I)

A. Fillmore’s Declaratory Judgment Claim Against Leasecomm

Fillmore brings a declaratory relief claim pursuant to G.L.c. 231A, §1[3] asking this court to void the agreement with Leasecomm because it is indefinite. The Appeals Court discussed the contract-law standard for definiteness in Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.
All of the essential terms of a contract must be sufficiently definite so that the nature and extent of the obligations of the parties can be ascertained. However, a contract is not to be held unenforceable if, when applied to the transaction and construed in the light of the attending circumstances, the meaning can be ascertained with reasonable certainty. Even if an aspect of an agreement is informal, obscure, difficult of satisfactory interpretation, and the subject of dispute by the parties as to its meaning, a court should [s]o far as reasonably practicable . . . give [ ] a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties.
42 Mass.App.Ct. 162, 170 (1997) (citations omitted) (quotations omitted).
Fillmore states that the subject matter of the lease — what he was actually leasing — is too indefinite to make the lease agreement enforceable. He asserts that the lease was for license number CD005056 and that this license is so vague that a court cannot force him to pay to obtain it. This claim of indefiniteness is in direct contradiction to Fillmore’s factual allegations that the license was for a User ID and a Password that enabled him to access a payment gateway. Fillmore admits that if he stopped making payments on his lease he would not receive the User ID and Password. “The nature and extent of the obligations” between Fillmore and Leasecomm “can be ascertained.” Has *562 tings Assocs., 42 Mass.App.Ct. at 170. Therefore, Leasecomm’s Motion to Dismiss Count I is allowed.

B. Fillmore’s Declaratory Judgment Claim Against Cardservice and Linkpoint

Fillmore also brings a claim for declaratory relief against Cardservice and Linkpoint on the theory that the lease is void for indefiniteness. Cardservice and Linkpoint argue that a declaratory relief claim against them is improper because no actual controversy exists between them and Fillmore for the purposes of G.L.c. 231 A, §1. “If there is no actual controversy, then declaratory relief is not available.” Gay & Lesbian Advocates and Defenders v. Attorney Gen., 436 Mass. 132, 134 (2002). “An actual controversy exists where there is a real dispute caused by the assertion by one party of a legal relation, status or right in which he has a definite interest, and the denial of such assertion by another party also having a definite interest in the subject matter . . .” Id. at 134 (emphasis added) (quotation omitted).
In this case, there is no actual controversy, for declaratory relief purposes, between Fillmore, Cardservice and Linkpoint. In his declaratory relief claim, Fillmore is seeking to invalidate a lease agreement between himself and Leasecomm. Fillmore admits that Leasecomm, not Cardservice, owns title to the license he leased. In addition, Linkpoint’s only connection to the lease is that it services the payment gateway that Fillmore’s lease enables him to access. Neither Linkpoint nor Cardservice have “a definite interest in the subject matter” of the lease. Therefore, Cardservice and Linkpoint’s Motion to Dismiss Count I is allowed.
II. Fillmore’s Claim for Rescission for Lack of Consideration (Count II)
Fillmore seeks rescission of the lease agreement with Leasecomm for lack of consideration. Fillmore alleges that he received nothing of value from Leasecomm in return for his lease payments. “The requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee.” Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 286 (1974). Legal detriment means:
Giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something which he was then privileged not to do, or not to refrain from doing. Benefit correspondingly must mean the receiving as the exchange for his promise of some performance or forebearance which the promisor was not previously entitled to receive.
Graphic Arts Finishers, Inc. v. Boston Redev.Auth, 357 Mass. 40, 42-43 (1970).
Fillmore alleges that he received no benefit from the Leasecomm lease, but his own factual allegations demonstrate otherwise. Fillmore agreed to pay $59.95 per month for forty-eight months for license number CD005056. Fillmore admits that the license consisted of a User ID and a Password that enabled him to access a payment gateway through which he could process credit card payments for his e-commerce business. Fillmore does not allege that the User ID and Password were defective in giving him access to the payment gateway; instead, he alleges that he could have obtained access to a payment gateway for less money or even for free. The fact that Fillmore possibly overpaid for the User ID and Password does not mean that he received nothing of value. He was able to access a payment gateway because of the license, therefore, he did receive, in exchange for his promise to pay, a benefit sufficient to satisfy the requirements of consideration. Therefore, Leasecomm’s Motion to Dismiss Count II is allowed.
III. Fillmore’s Claim for Rescission Based on Unconscionability (Count III)
Fillmore also alleges that the lease agreement with Leasecomm is unconscionable because of a gross disparity in the consideration exchanged between the parties. The Supreme Judicial Court reiterated the standard for unconscionability in Waters v. Min, Ltd.
Unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party and not to allocation of risk because of superior bargaining power ... If the sum total of the provisions of a contract drive too hard a bargain, a court of conscience will not assist its enforcement.
412 Mass. 64, 67-68 (1992) (citations omitted).
In determining whether the lease agreement was unconscionable it is helpful to examine the nature of the agreement between Fillmore and Leasecomm. Fillmore alleges that Leasecomm and Cardservice operated pursuant to a vendor agreement whereby Cardservice obtained credit information from Fillmore and furnished that information to Leasecomm for review, supplied a Leasecomm lease agreement to Fillmore, and undertook to have the license delivered to Fillmore. Once the product was delivered to Fillmore, Leasecomm paid Cardservice an agreed-upon amount to acquire title to the license, which was leased back by Leasecomm to Fillmore.
What Fillmore has alleged is essentially a standard finance lease arrangement.
A finance lease is a three-party transaction involving a manufacturer/supplier, a finance lessor (usually a financing company), and a finance lessee (the party that will use the particular personalty that is the subject of the transaction). The finance lessee selects the property that it needs from the supplier. Then, either the finance lessee or the supplier approaches a financing company, which purchases the property and, in turn, leases it to the lessee. The sine qua non of a finance lease is that the finance lessor acts as the supplier of money and not as a merchant in the goods.
*563 Steven R. Schoenfeld, Commercial Law: The Finance Lease Under Article 2A of the Uniform Commercial Code, 1989 Ann.Surv.Am.L. 565, 566. In essence, this arrangement enabled Cardservice to receive payment for its product earlier than it would have from Fillmore, without the risk of Fillmore defaulting on his payments, and it enabled Fillmore to pay for the license over a series of months instead of in a lump-sum payment at the time of purchase.
Leasecomm, as a finance lessor, is not liable to Fillmore for any defects in the license. The specific language of the lease agreement between Fillmore and Leasecomm states,
I understand that no servicing of any kind is provided by Leasecomm. I am to look to the dealer/supplier for any claims, servicing or warranties if any, and I specifically and unconditionally waive any claims, present or future, against Leasecomm. Any failure of service or misoperation of any kind, whatever, is no basis for nonfulfillment of my obligations under the lease.
Fillmore was on notice that this was a finance lease agreement. The consideration that Leasecomm provided to Fillmore was money. See Patriot Gen. Life Ins. Co. v. CFC Inv. Co., 11 Mass.App.Ct. 857, 862 (1981) (“When the commercial context has been, as here, a financing lease, the weight of authority is that the consideration which flows from the financing lessor is money, not a functioning product”). In exchange for a promise that Fillmore would pay Leasecomm a monthly lease payment for four years, Leasecomm agreed to buy the license outright from Cardservice. Therefore, the only type of suit that Fillmore can bring against Leasecomm is one having to do with financing. In the same way, a failure on the part of the supplier, Cardservice, to provide adequate consideration does not excuse Fillmore from making lease payments to Leasecomm. See Patriot Gen., 11 Mass.App.Ct. at 862 (“Accordingly a breach by the supplier of the equipment does not excuse the lessee from making lease payments to the finance-lessor, unless the equipment lease otherwise provides”). Therefore, Fillmore erred in bringing this rescission claim against Leasecomm, and Leasecomm’s Motion to Dismiss Count III is allowed.
IV. Fillmore's G.L.c. 93A, §11 Claim Against Leasecomm (Count IV)
Fillmore further alleges that Leasecomm’s actions and omissions constituted unfair and deceptive practices in violation of G.L.c. 93A, §11. The Supreme Judicial Court has established three considerations to be used in determining whether a practice is unfair or deceptive: “(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) . . . is immoral, unethical, oppressive, or unscrupulous; [and] (3) . . . causes substantial injury [to] . . . competitors or other businessmen.” Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)). As stated above, Leasecomm’s actions in this transaction were very limited. Leasecomm merely provided the financing for Fillmore to obtain License number CD005056. Fillmore chose to lease the license without any contact or representation from Leasecomm, and Fillmore explicitly disclaimed any liability on the part of Leasecomm for any deficiencies in the product. As a result — because this court has already determined that this lease was not void for indefiniteness, lack of consideration or unconscionability — Leasecomm’s actions and omissions do not rise to the level of unfair and deceptive practices. Therefore, Leasecomm’s Motion to Dismiss Count IV is allowed.
V. Fillmore’s G.L.c. 93A, §11 Claim Against Cardservice (Count V)
Fillmore alleges that Cardservice violated G.L.c. 93A, §11 through its unfair and deceptive trade practices. Cardservice asserts that it is not subject to claims brought under 93A because its alleged unfair and deceptive practices did not take place primarily and substantially in Massachusetts. See G.L.c. 93A, §11(8) (“no action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily or substantially within the Commonwealth”). The burden of proof is on Cardservice to show that these alleged actions did not occur primarily or substantially in Massachusetts. See id. The Supreme Judicial Court recently expounded on this issue in Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 473 (2003). It stated, “Section 11 suggests an approach in which a judge should, after making findings of fact and after considering those findings in the context of the entire §11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.” Two factors that the Appeals Court highlighted in interpreting this standard were (1) where the deception took place and (2) where the resulting harm occurred. See Auto Shine Car Wash Sys., Inc. v. Nice N Clean Car Wash, Inc., 58 Mass.App.Ct. 685, 686 (2003).
The center of gravity of the circumstances giving rise to Fillmore’s 93A claim was not in Massachusetts. Fillmore alleges that he was induced into signing the Leasecomm lease as a result of fraudulent representations and high-pressure sales tactics made by a Cardservice representative at a seminar in Washington state. Fillmore set up an e-commerce business in Washington State and had to make lease payments on the “valueless” license in Washington State. His business failed in Washington State and he is subject to collection in Washington State. The only connection Fillmore alleges Cardservice has with Massachusetts is that it entered into a finance leasing agreement with a Massachusetts corporation.
*564 Because Cardservice sold its product to a Massachusetts company, Fillmore believes Cardservice should be subject to a 93A claim in Massachusetts. Cardservice’s connections to Massachusetts are too attenuated to subject them to a 93A claim. The alleged “deception” and the alleged “harm” occurred in Washington state. See Auto Shine, 58 Mass.App.Ct. at 686. Therefore, because Massachusetts is not the “center of gravity of the circumstances that give rise” to Fillmore’s claim against Cardservice, the alleged unfair and deceptive trade practices did not occur primarily and substantially within Massachusetts. See Kuwaiti, 438 Mass, at 473. Cardservice is not subject to a 93A claim in this state and its Motion to Dismiss Count V is allowed.
VI. Fillmore’s Claim Against Cardservice for Civil Conspiracy and Aiding and Abetting (Counts VI and VII)
Lastly, Fillmore alleges that Cardservice engaged in a civil conspiracy with Leasecomm and aided and abetted Leasecomm’s unlawful conduct. Both claims for civil conspiracy and aiding and abetting require an underlying tort by a third party[4] — in this case Leasecomm. Norman v. Brown, Todd & Heyburn, 693 F.Sup. 1259, 1264 (D.Mass. 1988) (“Aiding and abetting is one variation of joint tort liability ... for harm resulting to a third person from the tortious conduct of another”); Kurker v. Hill, 44 Mass.App.Ct. 184, 188 (1998) (“civil conspiracy . . . derives from concerted action, whereby liability is imposed on one individual for the tort of another”). Because Fillmore has failed to adequately plead a claim of tort against Leasecomm, he cannot support a claim of civil conspiracy or aiding and abetting against Cardservice for Leasecomm’s tortious conduct. Therefore, Cardservice’s Motion to Dismiss Counts VI and VII are allowed.
VII. Defendants’ Motion to Dismiss For Lack of Subject Matter Jurisdiction
While the dismissal of the action obviates the need for resolution of whether class action plaintiffs may aggregate their claims in order to obtain the twenty-five thousand dollar threshold for bringing a civil action in Superior Court, the view of this court is appropriate. No Massachusetts appellate decision yet exists clarifying this issue. In addition, there is no consensus at the federal or state level about whether aggregation should be permitted. See e.g., Donald J. Saveiy, Federal Supplemental Jurisdiction in Diversity Cases: It’s No Party for Pendent Parties, B.B. J. Oct 2004, at 18 (2004) (the Federal Appeals Courts are currently split five to four on whether each plaintiff in a diversity case, including unnamed plaintiffs in putative class actions, must independently satisfy the seventy-five thousand dollar amount-in-controversy requirement); Thomas v. Liberty Noel Life Ins. Co., 368 So.2d 254 (Ala. 1979) (aggregation permitted); Judson School v. Wick, 494 P.2d 698 (Ariz. 1972) (aggregation permitted); Johnson v. Plantation Gen. Hosp., 641 So.2d 58 (Fla. 1994) (aggregation permitted); Ackerman v. Int’l Bus. Mach. Corp., 337 N.W.2d 486 (Iowa 1983) (aggregation permitted); Kentucky Dept. Store, Inc. v. Fidelity-Phoenix Fire Ins. Co., 351 S.W.2d 508 (Ky. 1961) (aggregation not permitted); Pollokoff v. Maryland National Bank, 418 A.2d 1201 (Md.Ct.Spec.App. 1980) (aggregation not permitted); Palsy v. Coca-Cola Co., 209 N.W.2d 232 (Mich. 1973) (aggregation permitted); N.H.Sup.Ct.R. 27-A(c) (aggregation permitted); OhioR.Civ.Pro. 23(F) (aggregation permitted); Berberian v. New England Tel. & Tel. Co., 369 A.2d 1109 (R.I. 1977) (aggregation not permitted); Gardner v. Newsome Chevrolet-Buick, Inc., 404S.E.2d 200 (S.C. 1991) (aggregation permitted when relief sought is equitable in nature); Bolling v. Old Dominion Power Co., 25 S.E.2d 266, 268 (Va. 1943) (aggregation not permitted).
Nevertheless, this court feels that there should not be a blanket prohibition against the aggregation of class action claims in order to meet the twenty-five thousand dollar jurisdictional threshold. Giving plaintiffs access to court when their “likely range of recovery would preclude any individual plaintiff from having his or her day in court” is one of the main purposes of the class action rule. See Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 93 (2001). It seems irrational to allow an individual plaintiff claiming more than twenty-five thousand dollars in damages access to the Superior Court and at the same time disallow access to class plaintiffs alleging the same amount collectively. Therefore, in order to carry out the policies underlying the concept behind “class action” litigation, this court feels that the Superior Court is the proper venue for class action cases where the plaintiffs’ aggregated claims exceed the twenty-five thousand dollar threshold.
ORDER
For the foregoing reasons, the Defendants’ Motion to Dismiss is ALLOWED.

a payment gateway enables merchants to process credit card transactions over the internet by encrypting data and transmitting it back and forth to an on-line data processing network.

Included in the gateway provider’s terms was the right to cancel Fillmore’s gateway services at any time without cause. A termination of Fillmore’s gateway services, however, would not release him from his obligations under the Leasecomm lease agreement.

G.L.c. 231A, §1 provides that this court “may on appropriate proceedings make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof occurred in any case in which an actual controversy has arisen.”

tyhere is a limited cause of action in Massachusetts for civil conspiracy, where there was no independent basis for imposing tort liability, when the “defendants acting in unison, had some peculiar power of coercion” over the plaintiff that they would not have had if acting independently. See Norman, 693 F.Sup. at 1264; Kurker v. Hill, 44 Mass.App.Ct. at 188. Fillmore, however, has failed to plead that Leasecomm and Cardservice coerced him into signing the lease. By his own admission, Fillmore acknowledges that only Cardservice was at the seminar where he was induced to sign the lease agreement.